# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Docket No. 0101 1:21-cr-10082-1** |
| | ) | |
| KEVIN NEWMAN, | ) | |
| | ) | |
| Defendant. | ) | |

### KEVIN NEWMAN'S SENTENCING MEMORANDUM IN SUPPORT OF HIS MOTION FOR DEVIATION FROM THE ADVISORY SENTENCING GUIDELINE RANGE

Defendant Kevin Newman (Newman) through counsel Robert L. Peabody, Esq. of Summit Health Law Partners, One Beacon St., Suite 1320, Boston, MA, 02108, and David Jellinek, Esq. of The Law Office of David Jellinek, 1163 Walnut St. #1, Newton, MA 02461, respectfully submit this sentencing memorandum in support of his Motion for Deviation from the Advisory Sentencing Guideline Range.

## INTRODUCTION

Newman respectfully asks the Court to adopt the advisory Sentencing Guideline range of **Level 17/CHC I** or a sentencing range of **24-30** months as calculated by the United States Probation Department (Kristina Zanini) in its July 2021 (Draft) Presentence Report (PSR). As the Court is aware, Newman pleaded guilty on April 9, 2021 to a one count Information charging him with Tax Evasion, in violation of 26 U.S.C. §7201. *Presentence Report (PSR) at ¶1-3.*

In accordance with U.S.S.G. §2T1.1(a)(1) (and the Tax Table at §2T4.1), the Base Offense Level is **20** because the agreed-upon tax loss in this case is $572,843 – or a dollar amount between $550,000 and $1,500,000 and in accordance with U.S.S.G. §2T4.1(H). *PSR at ¶22.* In consideration of his guilty plea and acceptance of responsibility, Newman also requests that the

Court reduce his Base Offense Level three (3) levels for a Total Offense Level of **17**. *PSR at ¶¶3(b)*. Newman has no criminal record (**CHC I**), therefore the PSR's advisory Sentencing Guideline range is **24 to 30 months**. *PSR at ¶¶3, 31, Part B.*

Apart from the Sentencing Guideline calculus, Newman asks the Court to deviate downward from Probation's advisory Guideline sentencing range based on his "history and [personal] characteristics" (among other §3553 (a) factors) and fashion "a sentence sufficient, but not greater than necessary, to comply with …" the directive of 18 U.S.C. §3553 (a) (2). Based on the significant impact incarceration would have on his family, his community, his landscaping business, Kevin Newman Landscaping and Tree, Inc. (KNLT), and Newman's KNLT employees who rely on him for their livelihood, Newman asks the Court to take these factors into account and fashion a just and reasonable sentence below the advisory Guideline sentence range; specifically a sentence of one year probation, a period to be served in either in a community or home confinement setting, a fine of $10,000, a significant period of community service (100 hours), and a Special Assessment of $100.

## BACKGROUND

Kevin Newman was born on April 29, 1950 in Boston, Massachusetts and has lived his entire life in this community. *PSR at ¶40*. Newman was raised by parents Leo and Mary Newman. *PSR at ¶40-42*. He had three siblings, one of whom (Laurie Newman) died in a car accident at age 42. His brother Paul Newman (age 75) and sister Maureen Newman (age 73) survive and live outside of Massachusetts. *PSR at ¶43-45*. Newman's father was an investment banker and his mother a homemaker. *PSR at ¶46*. While his father's income was not commensurate with other investment bankers, the family lived comfortably. *PSR at ¶46.*

Newman was quite close to his sisters, Laurie and Maureen, but less close to his brother Paul who was four years older. *PSR at ¶48.*

Newman attended Needham High School (NHS), played sports, and served on the student counsel. Newman sponsored two of the first METCO students (Massachusetts Council for Economic Opportunity) at the high school despite facing resentment from close friends who opposed Newman's efforts to integrate NHS. *PSR at ¶40.* During summers Newman, ironically, worked as a landscaper. Newman received *Diploma* from NHS in 1968. *PSR at ¶40.*

Newman attended Providence College and graduated in 1972 with a bachelor's degree in business. In his senior year of high school Newman dated Christine Machado. *PSR at ¶49.* They married when Christine became pregnant during Newman's first year at Providence College. The marriage was short-lived due to their young age and the strain of Newman working full-time and carrying a full academic load. They had a son, Michael Machado (age 51), and although the marriage did not last, Newman has remained in close contact with Michael, his eldest child. *PSR at ¶49.*

During college, Newman found work at a slaughterhouse where he worked thirty hours a week to earn enough money to support himself, his young family, and pay college tuition. *PSR at ¶49.* One of his friends from college, Edward Sullivan, noted that Newman's work ethic was evident then and vastly surpassed his own:

> We both needed to maintain jobs to make our way through school. Kevin had obligations away from school that he felt responsibility for. Kevin had started working at a pig slaughterhouse to make ends meet. If that sounds unpalatable it was even worse than that. I joined him at this fine establishment and I lasted 3 days. Kevin plowed through day after day and worked there for three years. He had personal obligations to fulfill, and he was going to do so under the most unpleasant possible work conditions. (Sullivan's letter attached as **Exhibit A**.)[1]

---

[1] More than eighty (80) letters of support have been submitted by Newman's friends, family, and clients. Some letters are quoted below and attached as exhibits. The remaining letters, also compelling, are attached, collectively, as Exhibit R.

Newman graduated from Providence College without debt. He was also a proud opponent of the Viet Nam war often joining anti-war protests on campus such as opposing military contractor Raytheon's visit to campus to interview students. *PSR at ¶47.*

Newman met his wife Karen Newman (age 68) the night he graduated from college. *PSR at ¶50.* They maintained a relationship even as she studied in England while Newman worked here in Massachusetts. They were married in 1979 at the United Parish of Auburndale (Parish) and have been together for over 43 years. *PSR at ¶52.* Together, they have four children: Tyler Newman (38), Kendell Sadiik (36), Macall Newman (34), and Brady Newman (32). *PSR at ¶50.* Newman was and continues to be a caring and devoted father and has a positive, close relationship with his children and grandchildren. *PSR at ¶50.*

After college Newman worked for a landscaping business in Boston (Gaylord Bigelow) and was promoted to foreman. Newman worked for Gaylord Bigelow for four years but left the company in 1979 to start his own landscaping business, KNLT. He started with nothing and worked hard to build the company to what it is today. He has seven full-time employees, as well as some additional seasonal workers. Many of Newman's employees have worked for him for twenty (20) years or more and rely on Newman for wages to support their families. At one point in 2016, KNLT had two full-time work crews serving more than 200 clients in eight (8) different towns in the greater Boston area. Newman has built his business from nothing into a thriving company that is respected by his customers and competitors.

## OFFENSE CONDUCT

When Newman started his landscaping/snow removal business in 1979 he owned one lawn mower, one vehicle, few customers, and one employee – Newman. Over the ensuing years, Newman built KNLT slowly but surely. He added new clients, purchased more equipment

(mowers, trucks, trailers, etc.), and a warehouse in Waltham to headquarter the business and garage equipment. During his 42-year career, Newman established a successful, viable business that enabled him to raise, educate, and support a family that included five (5) children. In the process, Newman has employed, essentially, the same seven (7) full-time people who have supported families of their own.[2]

Newman functioned as sole owner/manager of KNLT. Newman is the "face of the business" to existing customers and new clients developed through client referrals, word of mouth, and a sound reputation for landscaping services in greater Boston and MetroWest. Newman does all the hiring, bookkeeping, and banking (deposits/withdrawals) for KNLT. For the past decade, Newman has managed all client billing and job bids using *QuickBooks*. His CPA (TJ Tax Group LLC) has prepared yearly business (c-corp) and personal tax returns as well as the company's annual financial statement. Newman uses Paychex to oversee his weekly payroll as well as quarterly payroll and annual employment tax returns.

For twenty-five years, Newman's business ran efficiently. In 2010, however, his senior employee (Employee A) approached him and told him that a competitor had offered him a job promising $1500/week "cash." Employee A indicated that he would accept the offer unless Newman could match the deal. Newman could not afford to match the competitor, but to keep Employee A in KNLT's employ, Newman, regrettably, offered to convert $200 to $400 of Employee A's weekly $1500 pay to "cash" with the balance accounted for under his W-2. Employee A agreed to stay with KNLT on these terms and remains with the company today. Inevitably, KNLT's other employees learned of Newman's cash pay arrangement with Employee

---

[2] One of his employees has worked for KNLT for twenty-one (21) years and another employee for nineteen (19) years.

A and insisted on the same/comparable weekly "cash" pay to remain with the company.[3] Newman relented and for the next ten (10) years has paid his seven employees the aforementioned $200 to $400 of their weekly pay in cash.

To access cash needed to pay his employees, Newman deposited client checks (checks usually made payable to him not KNLT) into a personal savings account at his local bank from which he could withdraw enough cash to pay his employees their weekly allotment. What cash remained after the employees were paid Newman used to cover a mixture of personal expenses, like groceries, and business expenses including gas for trucks and miscellaneous equipment. Although these particular client payments were entered in QuickBooks, Newman never reported them as gross receipts of the business in KNLT's Form 1120 corporate tax returns.

Complicating his corporate tax fraud, Newman also, regrettably, charged some personal expenses to his corporate credit card that increased charges to the Cost of Goods Sold (COGS) entry on KNLT's corporate return inflating this line item between 15% to 20% annually and generating a larger than allowable business deduction for the company.[4] In sum, KNLT underreported corporate earnings/receipts and over-reported corporate expenditures (COGS) on its Form 1120 returns for nine consecutive (9) years starting with its 2010 return and concluding with the 2018 corporate filing. *PSR at ¶7-17.* Between 2014 and 2018, KNLT tax returns did not disclose gross receipts ranging from $85,000 in 2014 to more than $177,000 in 2018.

Newman's fraudulent corporate accounting, invariably, triggered comparable tax liability on his Form 1040 personal returns. The same gross receipt deficits left undeclared on KNLT's

---

[3] By then it became apparent to Newman that most, if not all, of his landscaping competitors were paying their employees cash "off the books." Moreover, if he wanted to stay in business and keep his current employees and/or attract new experienced workers, he would have to pay some of their wages in cash "under the table."

[4] For example, Newman used the company credit card for personal travel (hotel/airfare) on several occasions, an Air B&B accommodation, restaurant meals, clothing purchases, and other expenses.

Form 1120's translated into undeclared "qualified dividends" taxable to Newman as earned income on his personal 1040 for the corresponding years. *PSR at ¶7-17.* Between 2014 and 2018, Newman failed to pay income taxes ranging from $14,000 in 2014 to more than $31,000 in 2018.

All told, KNLT is liable to the government for $239,116 in corporate taxes (2014-2108) and Newman is responsible for $148,071 in unpaid personal income taxes for the same reporting period. Accounting for *relevant conduct* and related tax liability from 2010 to 2013, Newman owes an additional $188,655 in unpaid corporate taxes for a total tax liability of $572,843.[5] Newman intends to pay the aforementioned amount and satisfy the Court's anticipated Restitution order when he is sentenced on August 4, 2021 on one count of Tax Evasion, in violation of 26 U.S.C. §7201. *PSR at ¶1-3.*

## ARGUMENT

1. **The Court is required to determine the appropriate, reasonable sentence for Kevin Newman; one no greater than necessary to satisfy the sentencing factors/purposes of §18 U.S.C. §3553 (a) and following *Booker, Gall,* and *Kimbrough*.**

The Guidelines are no longer mandatory; they are advisory. *See United States v. Booker, supra, 543 U.S. 220 (2005).* Sentencing courts are required to consider the Guideline calculation as well as each of the sentencing factors and purposes of sentencing at 18 U.S.C. § 3553 (a) in fashioning an appropriate sentence. *See United States v. Gall, 128 S. Ct. 586, 596-97 (2007); Kimbrough v. United States, 128 S. Ct. 558, 570 (2007). See United States v. Martin, 520 F.3d 87, 91 (1st Cir. 2008).* Section 3553(a), "as modified by *Booker*, contains an overarching

---

[5] Newman retained the accounting firm of Wegner CPAs, LLP at the outset of this matter to review the QuickBooks records, his corporate and personal tax returns for the years at issue, as well as to review the government's tax loss calculations that were provided in the form of several Excel spreadsheets.

provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing...." *Kimbrough, 128 S. Ct. at 570.*

Section 3553(a) factors the Court should consider include "the nature and circumstances of the offense and the history and characteristics of the defendant." *18 U.S.C. § 3553(a) (1); See Gall, 128 S. Ct. at 596-97 & n. 6.* Other factors include consideration of the "general purposes of sentencing," that is, imposition of a sentence reflecting the seriousness of the offense, promoting respect for the law, and providing "just punishment" for defendant as well as specific and general deterrence. *Id.*

Although Sentencing Guideline calculations are the "starting point and the initial benchmark," for determining sentence, "the Guidelines are not the only consideration." The advisory Guidelines are just one factor to be considered in imposing sentence. *See Gall, 128 S. Ct. at 596-97.* The Court must weigh the applicability of the factors delineated in 18 U.S.C. §3553(a), then make an individualized, case-specific determination of the appropriate, reasonable sentence needed to satisfy the purposes of sentencing. *Id.* "This sequencing necessitates a case-by-case approach, the hallmark of which is flexibility." *See Martin, 520 F.3d at 91.* The Court's discretion in this regard is broad. *See Gall, 128 S. Ct. at 602 (2007); Martin, 520 F.3d at 91-92,* ("[A]fter <u>Gall</u>, the sentencing inquiry -- once the court has duly calculated the GSR -- ideally is broad, open-ended, and significantly discretionary.").

**2. A sentence of Probation that includes a period of community or home confinement and not incarceration is a "fair and just" sentence in Newman's case and sufficient, but not greater than necessary, to accomplish the intended purposes of sentencing for the following reasons.**

  **a. Newman's prompt, credible acceptance of responsibility for his illegal conduct is a significant factor for the Court to consider when imposing sentence.**

When federal agents arrived at Newman's Auburndale home on January 22, 2020 search warrant in hand, he agreed to sit down with SA Brian Simpson and answer, truthfully, questions about his business and his deficient payment of business taxes in prior years. Newman disclosed to the government his need for cash a decade earlier to pay employees a portion of their weekly pay, his related practice of depositing "some" checks to a separate account from which he could withdraw enough "cash" to pay his landscapers a portion of their weekly pay, and his unfortunate decision not to declare these funds as receipts on his business returns to reduce his tax burden. Although the government had authority to seize responsive materials under the warrant, Newman cooperated fully with agents locating documents, etc. and, generally, making their task less onerous.

In the ensuing months Newman, through counsel and with CPA assistance, met with the government on several occasions to ensure accurate tax loss amounts for which, later, he would need to reimburse the IRS. Thereafter, Newman agreed to plead guilty to the one Count Information currently before this Court. Perhaps most significantly, Newman has taken steps to satisfy the agreed-upon restitution amount ($572,843) at sentencing; a prospect that the Court noted ought to occur when Newman appeared before the Court in April 2021. Indeed, it will.[6] [7] Newman's behavior throughout the pendency of this case has demonstrated contrition, regret, and sincere acceptance of responsibility for his actions to date.

---

[6] Considering the extent of his cooperation with the government, to date, the Court can expect Newman to continue to work with the IRS to resolve outstanding "penalties and interest" obligations in the future.

[7] Newman has also fixed his payroll and accounting practices that resulted in his criminal charge. Employee weekly salaries are paid using Paychex and KNLT's payroll is properly accounted for in annual W-2 employee statements.

**b. The core of Newman's tax fraud, unjustified as it was, was intended to help his employees by putting more money in their pockets each week.**

Newman's efforts building KNLT over forty years reflects his dedication to his customers, his craft, and most of all his employees. The core of his tax fraud, unjustified and unfortunate as it was, was intended to help his employees put more money in their pockets on a weekly basis. Newman does not excuse his illegal conduct nor explain away what he admits was his intent to defraud the IRS by "shorting" business income disclosures and reducing KNLT's tax liability. Nonetheless, Newman's tax fraud directly benefited his employees who needed and wanted more weekly income to support themselves and their families but not add to their tax burden.[8]

More importantly, the criminal consequences (and associated tax debt) arising out of Newman's decision to pay his employees' cash impacts only Newman. Newman and the company are liable not only for the unpaid corporate tax on the undeclared/undisclosed company receipts, but he is also responsible, personally, for paying income tax arising out of all the "cash" payments made to his employees over this nine-year period on his personal 1040 return. In other words, the $537,324 in tax loss that he is repaying the government comprises, in part, income taxes that were the responsibility of his work force.

**c. Newman is a strong, moral, hard-working man who has raised a loving and supporting family, earned the respect of his clients, and is a life-long volunteer who remains a pillar of his community and Parish.**

Notwithstanding the impact of Newman's poor decisions and beyond the unnecessary mistakes made in business, Newman's KNLT clients, family, and friends have universally expressed their admiration of Newman's work ethic, empathy for others, and personal ethos.

---

[8] Newman's other bad decision to "hide" personal expenditures in his corporate credit card account only benefited him. This conduct was illegal; however, it constitutes a nominal percentage of the total tax loss Newman is liable for and which he is reimbursing the government, in full, at sentencing.

### (i)     Clients and Customers

Longtime customer Frank Albano wrote:

> Mr. Newman is one of the kindest, competent, honorable and friendliest people I know; I only wish him the best….Mr. Newman embodies…honest, friendly, kind and hardworking.  (Albano's letter attached as **Exhibit B**.)

Another customer, and neighbor, Margaret Hannah, commented that Newman was an "exemplary businessperson" with "attention to detail and personal care." (Hannah's letter attached as **Exhibit C**.) Newman's customers consistently expressed that Newman has a "strong" character, and, as noted by David Laurie, Newman "[is a] kind, loyal family man, loving of his children and his employees." (Laurie's letter attached as **Exhibit D**.)

### (ii)     Family and Close Friends

The impact of Newman's bad, life-changing decisions impacts the people Newman loves the most; his wife Karen and their five children. Newman's children speak of a devoted and always-present father, one who taught them compassion and empathy through his own behavior. Tyler Newman noted that his father was at every single game, recital, or performance.

> Through a foundation of love and honesty I have come to trust the lessons that he has taught me over the years, of kindness, generosity, selflessness, and integrity. He taught me these things through his example and through his actions.

> Growing up, my father would regularly volunteer to cook for Bristol Lodge, a local shelter for the less fortunate, even after working long days performing physical labor. He showed me how to be kind to absolutely everyone, whether it was sharing a joke with the janitor of the local high school while watching a game, or staving off marriage proposals from the developmentally disabled woman that approached him whenever she saw him in public. He treated everyone as an equal and showed me how everyone deserves respect, despite their circumstances or themselves.

Tyler also wrote that his father is the man he admires most in the world. (Tyler Newman letter attached as **Exhibit E**.)

Macall Newman noted that her father "set examples for us in terms of dedication, acceptance, [not showing] lack of judgment or entitlement" by working and waking up at 5:00 AM every morning and volunteering in the evenings after long, hard days. (Macall Newman's letter attached as **Exhibit F**.) Brady Newman remarked that his father "never missed an event" and that Newman worked tirelessly, often "out the door at 5AM and up until midnight" so that his family was cared for. Brady said that his father is his "hero." (Brady Newman's letter attached as **Exhibit G**.) Newman's daughter Kendell noted that her dad was always an excellent father, a "loyal mentor and a natural listener" and that he is also, now, "the ideal grandfather." She said he always "listen[s] deeply and without judgment." (Kendall Newman's letter attached as **Exhibit H**.)

Even the friends of Newman's children wrote to comment on the tremendous positive influence Newman has had on them. Sara Tabatabaie wrote that during her parents' difficult divorce Newman and his family welcomed her for dinner multiple times each week, and that:

> I just wanted to be in the safety of their family circle when mine felt so turbulent and so hard….their kindness is a big part of why I was able to steady myself, continue to do well in school, and to keep moving forward….Now, I'm 31 years old, and I'm still benefitting from Kevin's kindness….They've been stabilizing, loving, and unconditional forces in my life…(Tabatabaie's letter attached as **Exhibit I**.)

David Robb, another friend of Newman's children, said that "Kevin has been a … father figure to me….one of the most self-less, compassionate, motivated, loyal and caring individuals in my life." (Robb's letter attached as **Exhibit J**.)

### (iii)    Good Samaritan

A core theme contained in letters of support and illustrative of Newman is his service to the community. Over the years Newman has freely volunteered time and energy to help those less fortunate. Shortly after his college graduation, Newman contacted the Perkins School for the

Blind (Perkins) asking them what he could do to volunteer. Perkins had recently started a program teaching life-skills to blind teen-agers who had completed the school's academic program. Graduates usually remain on campus for a post-grad year learning necessary skills to live independently. Newman volunteered for this program and for a year took small groups of recent graduates grocery shopping, to Laundromat's to wash clothes, to church, and even to a local tavern to have a beer.

During this period of their lives the Newmans became devoted members of United Parish in Auburndale; the church where they were married. Their congregation was comprised of diverse, progressive parishioners from their neighborhood. The Newmans felt comfortable there and made many close friends during their association with the parish. Newman devoted time, money, and spirit to countless volunteer projects at the Parish for more than forty years. He joined church committees, led community outreach programs, and worked tirelessly behind the scenes to make the parish solvent, well-subscribed, and more engaged in the community.

There are many examples of Newman's generosity and volunteer spirit shared with his fellow parishioners. Pastor Catherine Michael echoes much of what Newman's friends have written about him. According to Rev. Michael, when a parishioner died and the family needed lawn care and other household help Newman volunteered his time to keep the lawns mowed and the grounds well-tended so that the house could be sold. (Rev. Catherine Michael's letter attached as **Exhibit K**; Rev. Ellis Johnson's letter attached as **Exhibit K2**.[9])

Newman's served on the church's vestry along with another parishioner who had two severely disabled children. Newman learned that the family's caregiver had quit unexpectedly

---

[9] Newman organized a church-led effort to re-build and landscape the backyard of a parishioner suffering from terminal cancer to enable her to play with her young son. Neighbor Sonia Parker wrote that after her husband "a proud lawn-tender died suddenly and unexpectedly… Kevin arranged for the lawns at our home to be cut all that summer. He would accept no payment." Parker's letter attached as **Exhibit L**.

leaving the family without care for their sons. Newman volunteered to come every morning at 6:00 AM to get the boys out of bed and dressed, teeth brushed, and hair combed to enable their parents to get ready for work and their sons to school. Newman made this extraordinary sacrifice over four (4) months despite four young children of his own to care for and a full-time job. (Rev. Johnson's letter attached as **Exhibit K2**; Parker's letter attached as **Exhibit L**; Zuar's letter attached as **Exhibit M**; Maureen Newman's letter is attached as **Exhibit N**.)

Newman also led a church group to New Orleans in 2005 and again to Biloxi, MI in 2008 in the aftermath of Hurricane Katrina to assist with rebuilding homes and communities, organized different service projects coinciding with Martin Luther King, Jr. Day, and continues to volunteer in the kitchen of the Bristol Lodge in Waltham cooking and serving meals to the homeless residents. (Rev. Johnson's letter attached as **Exhibit K2**; Karen Newman's letter attached as **Exhibit O**.)

In sum, Newman's friends describe a man of dedication to and consideration of others. For example, a week before 9/11 family friend Marybeth Reid delivered her daughter to college in Boston. Reid described the following:

> [When] the Twin Towers were attacked….[and] [b]efore I could contact my daughter, Kevin and Karen Newman had gone to pick up (daughter) Caris and her college roommate to take them to the safety of their home. I will be forever grateful to them for protecting my daughter during such a unsettling time. (Reid's letter attached as **Exhibit P**.)

Anne Guidice, a friend needing a break from caring for her ill husband summed it up best – "everyone should have a Kevin Newman in their life." (Guidice's letter attached as **Exhibit Q**.)

> **d.    A non-custodial sentence will allow Newman to continue working and operating KNLT, provide landscaping services to many loyal clients of long standing, and keep his work force fully employed.**

Newman is a "working man." He has worked his entire adult life at hard, labor-intensive jobs; most notably as a full-time meat cutter in a Rhode Island abattoir for four years during college and the last forty years as landscaper. His workday starts early and ends late and requires non-stop use use/operation of trucks, trailers, and other large equipment. He serves as the "foreman" to two different work crews but is not above mowing lawns, pruning trees, and shoveling mulch, himself. Newman is 71 years old but has the stamina of a much younger man.[10] As owner and operator Newman also handles all the business and financial tasks of small business.

Newman needs to keep working. A custodial sentence will cripple if not kill his business altogether.[11] The clients that he has developed over the years are the product of personal relationships that he initiated and nurtured over time. If Newman is imprisoned and KNLT folds in his absence, his competitors will move quickly to absorb his customers and prospects of reclaiming them after his return will be diminished.[12] Perhaps worse, his employees – hard working but unable to manage the business in his absence – will lose their long-standing

---

[10] Newman's wife, Karen, has commented that her husband of over forty years continues to work twelve-hour days and only owns work clothes – jeans, boots, work shirts, and ball caps and most of them are well used and fraying. Newman's non-work clothes are limited, she says, and take up very little room in his closet.

[11] Not working will, likely, have a negative impact on Newman's self-respect and mental health.

[12] Much to Newman's embarrassment and regret, many community newspapers in towns where his clients live and where KNLT works published news stories about Newman's federal criminal charges following his change of plea in April 2021. To be sure, Newman's competitors will capitalize on the media fallout to absorb Newman's existing clients should he receive a custodial sentence from the Court. See https://www.wickedlocal.com/story/newton-tab/2021/04/09/newton-landscaper-pleads-guilty-tax-evasion-says-justice-dept/7164947002/; https://patch.com/massachusetts/newton/newton-landscaper-accused-tax-evasion; and https://www.facebook.com/groups/86518526100/permalink/10159034792886101/.

employment with, perhaps, limited prospects of catching on with another business this deep into the landscaping season.

Permitting Newman to serve a non-custodial sentence, one comprising probation, a period of either community or home confinement, an appropriate fine, and even a significant amount of community service component will allow Newman to keep KNLT afloat, keep his work force fully employed, and enable him to earn valuable income in the future. To be sure, Newman will need additional earned income going forward to pay the anticipated IRS civil fraud penalty and interest charges on what, to date, has been significant unpaid taxes; an amount certainly in the hundreds of thousands of dollars.

**3. Tax fraud cases in this District involving similarly situated defendants with no criminal history and who made "under the table" cash payments to their employees or "skimmed" took cash from the business offer guidance on an appropriate disposition in Newman's case.**

The Court is sensitive to the need "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. §3553(a) (6); *and United States v. Doan*, 498 F. Supp. 2d 816, 820 (E.D. Va. 2007) (assessing similarly situated defendants with similar backgrounds/records, culpable of committing similar acts valuable to sentencing). To that end, Newman contends that a probationary sentence with a period of either community/home confinement is consistent with sentences imposed on some similarly situated defendants that committed payroll-related tax fraud.

In *United States v. Tutunjian*, 16-cr-10225- DPW (D. Mass), defendant pleaded guilty to a five count (5) Information charging him with tax evasion and other offenses. Tutunjian, the owner of *Boston Cab*, intentionally concealed the size of his company's payroll by paying employees, entirely or partially, in cash. The tactic kept defendant's cash payments "off the books" ensuring no record of cash payments traceable by an IRS audit. For employees who were

illegal aliens, Tutunjian never issued W-2's let alone withheld or paid federal income tax for these employees. Tutunjian's tax loss was calculated at $2,090,730.

The government recommended 24 months incarceration (guideline range 25-30 months), a fine, and restitution. Tutunjian requested probation as an appropriate sentence. The court imposed a sentence of 20 months probation, 18 months to be served in a community confinement setting – "Coolidge House or similar Community Confinement program." The Court also imposed a $28,990 fine and restitution in the unpaid amount: more than $1.0 million.

In the Statement of Reasons explaining why it imposed sentence below the guideline range, the court pointed to defendant's age, charitable service/good works, and physical condition as factors warranting a probationary sentence. The court also cited defendant's significant acceptance of responsibility and his good conduct pre-trial as additional factors supporting probation. The court was satisfied that the sentence "afforded adequate deterrence" for Tutunjian from engaging in future criminal behavior. 18 U.S.C. §3553(a)(2)(B). (The Statement of Reasons in *Tutunjian* attached as **Exhibit S**.)

Admittedly, the court weighed Tutunjian's age (67), health and access to treatment as factors recommending probation. Notwithstanding, the Newman and *Tutunjian* share common threads. Newman may be in better health, but both are older men – Newman is 71 years old. Both men have strong family/friend support and reputations for charitable work and doing "good deeds" within their community. Both cases involve paying employees "cash" under the table, although by all accounts, Tutunjian's fraud was far more widespread, effecting many more employees (including illegal aliens), and generating tax losses four (4) times greater than Newman's. A significant difference in their cases, is that Tutunjian was able to pay only 50% of

tax loss restitution owed at sentencing while Newman intends to satisfy his restitution obligation at sentencing.

In *United States v. Koudanis, et al.,* 15-cr-10387- PBS (D. Mass), a matter previously before this Court, four defendants pleaded guilty to multiple tax accounts, including conspiracy to obstruct the IRS and aiding in the filing of fraudulent tax returns. Lead defendants Nicholas Koudanis and Nicholas Markos, owners/operators of *Nick's Roast Beef* in Beverley, MA, were charged with "skimming" more than $6.0 million in cash receipts from the business over six years then failing to report earned income on the corporate tax returns and their personal 1040s. Their actions enabled them to evade nearly $1 million in personal income taxes. Nicholas Koudanis's wife and son, Eleni and Stephen, also pleaded guilty to their part in the conspiracy.

The government recommended guideline sentences for Eleni and Stephen Koudanis between 18-27 months and Nicholas Koudanis between 37-46 months.[13] This Court varied downward imposing one year of probation for mother and son based on their roles in the offense. Stephen Koudanis received a reduced 24-month sentence in accordance with a "binding pleas agreement for variance." Significantly, Nicholas and Eleni Koudanis and Nicholas Markos were ordered to pay $2,042,366 restitution (tax loss) on a joint and several basis. None of the parties were able to pay restitution, it appears, in advance of sentencing. (The Criminal Judgments and/or Statements of Reason for the four (4) *Koudanis* defendants attached as **Exhibit T**.)

Compared with *Koudanis*, Newman's tax fraud conduct, prompt acceptance of responsibility/cooperation with authorities, and efforts to pay his restitution sooner than later, supports a sentence of probation, etc. with a component of community/home confinement. Newman took cash receipts from his business but nothing commensurate with the amounts and

---

[13] Nichols Marcos's guideline sentence was the same as Nicholas Koudanis (37 to 46 months), however, he received a sentence of one-year probation with the benefit of a §5K1.1 substantial assistance letter.

frequency Koudanis and Marcos "skimmed" from their business weekly. Likewise, Newman used the cash funds to supplement his employees' weekly pay as opposed to pocketing same for gambling or other personal needs.

Nicholas Koudanis received 24 months in prison based on his alarming offense conduct and the sheer size of the fraud and resulting tax loss – $1.0 million <u>each</u> for Markos and Koudanis. Nonetheless, the Court still imposed a 13-month downward variance for Koudanis imposing 24 months, or what would be the low-end of Newman's own advisory guideline range. *See also United States v. Angiulo*, 20-CR-10218-DPW (D. Mass) (where defendant faced tax loss of $3.3 million, guideline range of 37-46 months, and government recommendation of 27 months incarceration, court imposed 42 months probation, 18 months in home confinement, in addition to one year of community service.)[14]

## **CONCLUSION**

For these reasons and other considerations relevant to the Court, Kevin Newman respectfully requests that the Court deviate downward from the advisory Guideline sentence

---

[14] The U.S. Sentencing Commission's Federal Sentencing Statistics by District, Circuit, & State (by fiscal year) offers statistical data about dispositions in tax cases in this District. See https://www.ussc.gov/research/data-reports/federal-sentencing-statistics-district-circuit-state.

Since 2017, there have been 68 tax cases in the D. MA, less than half (32) resulted in BOP sentences with the remainder (36) resulting in either straight "Probation Only" or "Probation and Alternatives." The average "Mean" sentence for the past four years was 10 months while the average "Median" sentence for the same period was 8 months.

Important takeaways from Newman's perspective include: a) more than half the defendants in tax cases (53%) received Probation or Probation and Alternatives (i.e. community/home confinement); b) both the mean or average BOP sentence (10 month) and the "median" sentence (8 month) imposed was significantly below sentencing guideline ranges for tax defendants who pleaded guilty (and accepted responsibility). These cases usually involved **Level 19**, 30 to 37 months; **Level 17**, 24-30 months; and **Level 15**, 18 to 24 months.

Taken as a whole, the Commission's statistics indicate that a majority of tax defendants receive below-guideline sentences of Probation or the like; and those defendants who receive custodial sentences serve sentences considerably <u>below</u> their calculated guideline ranges – sentences ranging from 8 to 10 months.

calculation and impose a fair and reasonable sentence consistent with Newman's recommendation.

Respectfully submitted,

**KEVIN NEWMAN**

By his attorney,

/s/ Robert L. Peabody
Robert L. Peabody (BBO No. 551936)
SUMMIT HEALTH LAW PARTNERS
One Beacon Street, Suite 1320
Boston, MA 02108
rpeabody@summitheathlawpartners.com
(617) 598-6700

/s/ David M. Jellinek
David M. Jellinek
Law Office of David Jellinek
1163 Walnut St. #1
Newton, MA  02461
jellinek@me.com
857 234 0135

Dated: July 28, 2021

## <u>CERTIFICATE OF SERVICE</u>

I, Robert L. Peabody, pursuant to LCvR 5.6 (*Service of Documents by Electronic Means*), hereby certify that a true copy of the above document was served on Assistant U. S. Attorney Sara M. Bloom by filing electronically using CM-ECF system this July 28, 2021.


/s/ **Robert L. Peabody**
Robert L. Peabody

*4849-9840-6961, v. 4*